In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3235

REFINED METALS CORPORATION,

*Plaintiff-Appellant,*

*v.*

NL INDUSTRIES INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-02565 — **Sarah Evans Barker**, *Judge.*

ARGUED MARCH 25, 2019 — DECIDED AUGUST 22, 2019

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. This is a case about who should bear the costs of cleaning up a contaminated lead smelter site in Beech Grove, Indiana, a suburb of Indianapolis. Plaintiff Refined Metal Corporation ("Refined") has owned the site since 1980, when it acquired it from defendant NL Industries Inc. ("NL"). After years of litigation involving both the federal En-

vironmental Protection Agency ("EPA") and the Indiana Department of Environmental Management ("IDEM"), Refined entered into a settlement with both agencies in 1998. The 1998 Decree, as we will call it, required Refined to close the site, pay a $210,000 fine, and remedy the contamination. For their part, EPA and IDEM agreed not to bring suit against Refined on at least some of their potential claims (though the parties dispute the scope of those covenants). These covenants not to sue took effect immediately upon the entry of the 1998 Decree. In 2017, almost 19 years later, Refined sued NL to recoup some of the cleanup costs for which it is responsible.

A delay of 19 years is a long time to keep an entitlement to reimbursement up in the air. The question before us is whether it is so long that Refined lost its statutory right to bring this action. The district court found that Refined's claim qualified as a "contribution action" under section 113(f)(3)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(f)(3)(B). Contribution claims are subject to a three-year statute of limitations, and so the court dismissed the suit on that ground. It also relinquished supplemental jurisdiction over Refined's state law claims. On appeal, Refined argues that its suit is instead a "cost-recovery" action under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and that it would be timely under that subsection's more permissive limitations period. NL contends that it wins no matter which CERCLA provision applies, given that the statute of limitations applicable to section 107(a) is only six years and, as NL sees things, that clock began running and expired long ago.

It matters, in our opinion, whether this is a section 113(f)(3)(B) contribution action or a section 107(a) cost-recovery case. If it were the latter, we would need to conduct a searching examination of what actions to clean up the site anyone has taken, and when. But we can skip that inquiry, because we agree with the district court that this is a section 113(f)(3)(B) contribution action, and the limitations period had expired by the time Refined filed suit. We therefore affirm the decision of the district court.

## I

CERCLA, commonly known as the Superfund Act, "shifts the cost of [an environmental] cleanup to the parties responsible for creating the hazard and away from taxpayers, who otherwise would be left to pick up the bill." *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 689 (7th Cir. 2014). The statute identifies who may be held liable; they are called "potentially responsible parties" or PRPs in the jargon of environmental law. If a PRP believes that it has paid or may become liable for paying "cleanup costs in excess of its fair share," *id.*, the statute permits it to seek compensation from other PRPs.

There are two such routes available to someone seeking to recover from a PRP: a section 107(a) "cost-recovery" action and a section 113(f) "contribution" action. *Bernstein v. Bankert*, 733 F.3d 190, 206 (7th Cir. 2013). A plaintiff such as Refined will often prefer to proceed under the cost-recovery provision in section 107(a), because it not only contains a longer statute of limitations, but it also bars defendants from asserting equitable defenses. *NCR Corp.*, 768 F.3d at 690. These plaintiff-friendly provisions make sense: section 107 generally, if not always, operates as an avenue for recovering "costs incurred

during a self-initiated environmental cleanup" rather than one spurred by a lawsuit or settlement. *Id.* But if either statutory trigger for a section 113(f) contribution action is present—a qualifying lawsuit under section 113(f)(1) or a qualifying settlement under section 113(f)(3)(B)—the plaintiff may proceed only under that provision. See *Bernstein*, 733 F.3d at 206 ("[A] plaintiff is limited to a contribution remedy when one is available.").

The statutory trigger at issue in this case is the one spelled out in section 113(f)(3)(B), which creates a right to contribution for a party that has "resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement." (A "response" is a term of art in CERCLA that encompasses both short-term "removal" actions and more permanent "remedies" or "remedial actions." 42 U.S.C. § 9601(25)). The district court found that the 1998 Decree resolved enough of Refined's liability to qualify as "an administrative or judicially approved settlement" under section 113(f)(3)(B). Since the three-year clock for contribution suits starts when the settlement is entered, the district court ruled that the statute of limitations ran out in 2001 and this suit was time-barred.

On appeal, Refined advances nine issues, which we have reorganized into three principal arguments, in support of its contention that the 1998 Decree did not trigger a section 113(f)(3)(B) contribution claim. If it is correct, and if other conditions were satisfied, then it would be able to pursue a section 107 cost-recovery claim. First, Refined asserts that its refusal to admit liability in the 1998 Decree meant that the Decree did not actually "resolve[] its liability to the United States

or a State for some or all of a response action," as the statute requires. Second, Refined argues that only settlements that resolve liability for CERCLA-specific violations qualify as predicates for section 113(f)(3)(B) claims. As Refined reads it, the 1998 Decree included only covenants from the agencies not to sue Refined under other statutes—in particular, the Resource Conservation and Recovery Act (RCRA) and the Clean Air Act—and left Refined's CERCLA liability open. Refined asks us to find that this is an independent reason that the 1998 Decree could not have triggered a contribution action. Third, Refined argues that it could not have sought a "contribution" from NL because, in its view, NL and Refined are not "joint tortfeasors." We address its arguments in that order.

## A

In determining whether the 1998 Decree qualified under section 113(f)(3)(B), Refined urges us to focus on the presence or absence of an admission of liability. But that is not the central inquiry. We recognize that in *Bernstein*, we found that a settlement had not resolved enough of the PRP's liability to trigger a section 113(f)(3)(B) claim, but the circumstances are important. We reached this result when (1) the settlement expressly stated that the defendant companies did not admit any liability or the validity of the EPA's findings; *and* (2) the covenants not to sue were not immediately effective, but instead were conditional on complete performance of the terms of the settlement. 733 F.3d at 212. The district court in this case found it "clearer than a remediated stream" which of the two factors the *Bernstein* court found dispositive: the lack of an immediately effective covenant not to sue. The *Bernstein* court emphasized that "if the EPA had included an immediately effective promise not to sue as consideration for entering into

the agreement, *the situation would be different.*" *Id.* at 213 (emphasis added). We have in this case that "different" situation. *Bernstein* also noted that it was "very difficult to say, in light of [a section from the settlement in which the defendant companies refused to admit liability], that the agreement between the parties constituted a resolution of liability." *Id.* at 212.

And we do not need to guess what effect each of the two factors *Bernstein* identified would have in isolation, because we have revisited this topic. In *NCR Corp.*—a case Refined does not even cite in its opening brief—we found that a settlement's inclusion of an immediately effective covenant not to sue meant that a PRP had "resolved its liability … for some or all of a response action," which in turn started the clock on a contribution claim. 768 F.3d at 682. In its reply brief, Refined points out that "the *NCR* Court makes no mention of a non-admission clause, an issue raised in *Bernstein.*" But that is precisely why *NCR* dooms Refined's argument. In *NCR*, the *only* factor that the court explicitly discussed as a reason for distinguishing the settlement from the one in *Bernstein* was the immediate effectiveness (as opposed to conditional nature) of the covenant not to sue. Granted, the court noted that the settlement before it "diverge[d] in every meaningful way from the one in *Bernstein* that left section 107(a) liability available." 768 F.3d at 692. Yet its reasoning leaves no doubt that the immediately effective covenant not to sue was the dispositive point. Because that factor is present in this case, the mere fact that Refined refused to admit liability is not enough to exempt the 1998 Decree from the reach of section 113(f)(3)(B).

B

We now turn to the scope of the covenants not to sue that were included in the 1998 Decree. All agree that they were not comprehensive. Both EPA and IDEM included clauses reserving their rights to file suit under particular statutes. The question relates to both the content and the effect of those reservation clauses—in particular, their effect on Refined's eligibility for a contribution remedy as of the date of the Decree. Refined asserts that the Decree left its CERCLA liability unaffected, and that at least some of its liability *specifically for a violation of CERCLA* would have to be resolved in order for the 1998 Decree to support a section 113(f)(3)(B) contribution action. NL disputes both of these points. It argues that the Decree actually *did* resolve some of Refined's CERCLA-specific liability, since IDEM's reservation clause says nothing about CERCLA, suggesting that the state agency had given up the ability to proceed under that statute. NL also contends that none of this matters. As it reads section 113(f)(3)(B), a settlement need only resolve some portion of a PRP's liability for a cleanup—under any statute—in order to trigger a contribution action. We agree with the latter point: a settlement need not resolve CERCLA-specific liability in order to start the clock on a contribution action.

Multiple reasons support an interpretation of section 113(f)(3)(B) that does not limit covered settlements to those that specifically mention CERCLA. First, the *other* trigger for a contribution action—section 113(f)(1), which allows parties to seek contribution "during or following any civil action under section 9606 of this title or under section 9607(a) of this title"—explicitly limits its applicability to civil actions

brought under CERCLA. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal citation and quotation marks omitted). While this maxim should not be applied mechanically, the disparity between these two closely related subsections in section 113(f) is a strong indication that Congress meant for the universe of qualifying settlements under section 113(f)(3)(B) to be broader than those specifically mentioned in section 113(f)(1).

There is further support for this reading in the text and structure of the Act. The trigger for section 113(f)(3)(B) encompasses settlements that leave at least *some* liability open, given that this subpart of the statute describes a qualifying settlement as one that "has resolved [a defendant's] liability to the United States or a State for *some or all* of a response action or for *some or all* of the costs of such action." (Emphasis added). We have observed that CERCLA does not favor "slicing and dicing of costs incurred under the same administrative order … ." *NCR Corp.*, 768 F.3d at 692. The same logic applies here. The text demonstrates Congress's intention to encourage parties that have reached even a partial settlement with respect to a contaminated site to act expeditiously in identifying costs, seeking compensation where necessary and completing the required cleanup.

Refined's reading of section 113(f)(3)(B), in contrast, would allow settling parties to drag out the process of seeking those funds until they "initiat[ed] … physical on-site construction of the remedial action"—in other words, until the six-year statute of limitations for a cost-recovery action under

section 107(a) begins to run. As Refined sees things, despite years of cleanup work on the site, that clock did not start here until the EPA approved "final corrective measures" in 2014. We do not need to decide whether the 1998 Decree actually did permit Refined to wait almost two decades before undertaking the requisite on-site construction. (Recall NL's backup argument that Refined long ago undertook enough work on the site to start and eventually run out the 107(a) clock.) That is a question of interest only to Refined and the EPA. Our concern is with Refined's right to insist that someone else—here, NL—share that bill. In that connection, it is worth noting that Refined's reading of the statute would have allowed it to wait almost 19 years before filing suit to recover any costs from NL for any actions covered by CERCLA that were incurred in the course of complying with the 1998 Decree.

We would need a much stronger statutory basis than we have before we would adopt that position. As the district court noted, it would undermine the purpose of a statute of limitations if "a plaintiff [could] choose when a limitation period to which it is subject begins to run." That is effectively the rule that Refined asks us to bless here. Short statutes of limitations encourage swift action, and that is the regime Congress chose for the settlement trigger in section 113(f)(3)(B).

The statutory text also specifically contemplates settlements that resolve liability under state, rather than federal, law. This makes it even more unlikely that Congress was concerned only with liability under the federal CERCLA statute. Section 113(f)(3)(B) speaks of settlements that resolve liability "to the United States *or a State* for some or all of a response action." States have an independent right of action under CERCLA. See *Niagara Mohawk Power Corp. v. Chevron U.S.A.,*

*Inc.*, 596 F.3d 112, 126–27 (2d Cir. 2010) ("Under CERCLA, states have causes of action independent from the federal government."). But states also have myriad environmental laws of their own that might be implicated by an enforcement action. See, *e.g.*, CERCLA § 121(e)(2), 42 U.S.C. § 9621(e)(2), stating that "[a] State may enforce any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under this chapter … ." Perhaps there are state environmental statutes or enforcement actions that are so far afield from CERCLA and its concerns that a defendant subject *only* to state enforcement action would not be on notice that a federal clock was ticking. But that is not the case before us. Indiana settled with Refined in 1998 at the same time as the federal government, and the EPA's reservation clause shows that the cleanup implicated CERCLA. Whatever the scope of the EPA's covenant not to sue, Refined certainly resolved its liability to "a State for some or all of [the] response action."

Refined expresses a practical concern about this straightforward reading of the statute. The 1998 Decree began a years-long period of cleanups that required federal oversight and approval, culminating in the EPA's 2014 approval of "final corrective measures." Refined objects that a three-year statute of limitations would require it to initiate a contribution action long before the full scope of its liability became certain. But that is nothing new: in tort law, the statute of limitations begins running on the day of the accident, even though damages such as the full cost of medical care and lost income often must be estimated, since they stretch far into the future. In addition, as the district court noted, "*NCR* rejected as contrary to *Bernstein* and common sense the notion that no settlement 'resolves' liability until the work under it is complete." We

also agree with the district court that a declaratory judgment could help mitigate such *ex ante* uncertainty. CERCLA section 113(g)(2), which governs the statute of limitations for section 107(a) actions, anticipates this problem by requiring courts to "enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). We see no reason why the lack of such a *mandatory* provision in section 113(f) should be read to strip courts of their discretionary power to issue declaratory judgments in such cases, where appropriate.

Finally, our holding is consistent with those of the majority of circuits that have considered the question. See *Asarco LLC v. Atlantic Richfield Company*, 866 F.3d 1108, 1120–21 (9th Cir. 2017); *Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 136–37 (3d Cir. 2013). The Second Circuit appears to be an exception: it has held that a settlement must explicitly resolve CERCLA liability to trigger a contribution action. *Consolidated Edison Co. of New York v. UGI Utilities*, 423 F.3d 90 (2d Cir. 2005). On the other hand, as the district court noted, the Second Circuit later cast serious doubt on that part of *UGI Utilities* (without quite overruling it, since the issue was not squarely presented). See *Niagara Mohawk Power Corp.*, 596 F.3d at 126 n.15 (noting that there was a "great deal of force to th[e] argument" of the EPA as amicus that *UGI Utilities* was wrongly decided). Whatever the state of the law in the Second Circuit, we are persuaded by the view adopted by the Third and Ninth Circuits.

C

Refined spends much of its brief advancing a different argument altogether for its contention that a contribution action could not have accrued. This one is based solely on common-law principles. Refined asserts that it could not seek anything in the nature of "contribution" from NL because it did not share liability with NL for the underlying "tort." In support of this reasoning, Refined cites the Supreme Court's decision in *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007), which notes that a contribution action under section 113(f)(1)—*not* the statutory trigger at issue here—requires "common liability stemming from an action instituted under section 106 or section 107(a)." *Id.* at 139. To show that it lacked common liability with NL, it points to the Supreme Court's decision in *Meghrig v. KFC Western*, 516 U.S. 479 (1996), which held that RCRA—one of the statutes under which the federal government proceeded—does not provide a private cause of action to recover costs for "the cleaning up [of] toxic waste that does not, at the time of suit, continue to pose an endangerment to health or the environment." *Id.* at 481.

We find this argument puzzling. First, how is it that NL can somehow be, at the same time, *not* jointly liable for the actions required under the 1998 Decree and yet still liable to Refined once Refined "could show that its actions incurred more than its fair share of costs *for which both parties are liable*"? Appellant's Br. at 21 (emphasis added). Either NL has some liability for these cleanup costs or it does not. It is beside the point that "the 1998 RCRA Consent Decree neither finds nor addresses any liability of NL …" *Id.* at 2. NL was a non-settling party. The contribution provision in section 113(f)(3)(B)

exists to allow settling parties to seek contribution from a non-settling party. It was for Refined to establish, in the course of making a timely contribution claim, that NL was liable under the statute, and for what amount. Refined failed to do so. It is also unclear why *Meghrig* has anything to say about this situation. The *Meghrig* Court held that RCRA does not authorize parties to seek compensation for already completed cleanup efforts, but it explicitly recognized that CERCLA does (within the applicable statute of limitations). 516 U.S. at 486–88. After all, that is why Refined is here. The fact that the federal government brought suit and settled under RCRA tells us nothing about whether, as of the date of settlement, CERCLA provided Refined with an independent mechanism for seeking compensation.

Apart from its peculiar nature, Refined's "common liability" argument has another problem: Refined waived it in the district court. Refined's response to NL's motion to dismiss did not so much as mention this argument, let alone develop it. Refined tries to dig itself out of that hole with the assertion that its arguments on this point "flow naturally from the legal analysis and decisions of [the cases it cited below]." Reply Br. at 24. But citing a few cases that might (or might not) implicate a separate line of argument is not good enough. A thorough treatment of Refined's argument could potentially require deciding one or both of (1) how much liability NL might have had, if any, under RCRA and the Clean Air Act; and (2) whether the Supreme Court's interpretation of section 113(f)(1) in *Atlantic Research* applies with equal force to section 113(f)(3)(B), a different subsection covering a different situation. The district court did not deal with these issues, because Refined never briefed them. It is therefore too late for Refined to raise them now.

## II

There remains the question of Refined's claims under Indiana's Environmental Legal Actions ("ELA") statute. Once it dismissed the federal claims, the district court relinquished supplemental jurisdiction over the state-law claims. See 28 U.S.C. § 1367(c). We review this decision for abuse of discretion. *Montano v. City of Chicago*, 375 F.3d 593, 601 (7th Cir. 2004). The district court found nothing to rebut what we have called the "sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Refined offers no reason for finding an abuse of discretion here. It merely asserts that its claims under the ELA "should be allowed to proceed on remand to the District Court." It has therefore waived any challenge to the district court's decision to relinquish its supplemental jurisdiction.

Similarly, Refined has not explained why we should upset the district court's admittedly very technical ruling that Refined did not properly support the existence of diversity jurisdiction under 28 U.S.C. § 1332. In the district court, Refined alleged that "[t]he amount in controversy in this action exceeds $75,000 and is between citizens of different states … ." But the district court found that this was "ineffective" because Refined failed to specify that the amount in controversy exceeded $75,000 "exclusive of interest and costs," as required by 28 U.S.C. § 1332(a). The court cited *Powers v. Fultz*, 404 F.2d 50, 52 (7th Cir. 1968), for the proposition that it was proper to dismiss a complaint for failing to address interest and costs. This result may or may not be required by *Powers*, where the complaint (unlike the one before us) also alleged that the

amount in dispute was *exactly* $10,000 (then the amount specified in the statute) rather than a claim in excess of the required amount. Here, the plaintiffs did plead an amount in controversy in excess of the statutory minimum; they just neglected to specify that the excess existed exclusive of interest and costs.

In the end, however, we have no need to decide whether the state claims fell within the court's diversity jurisdiction, because Refined has again dropped the ball. It never sought leave to amend in the district court to cure the apparent deficiency. In its opening brief to this court, Refined asserts that "[j]urisdiction also exists based on the diverse citizenship of the parties pursuant to 28 U.S.C. 1332" and that "[t]he amount in controversy exceeds seventy-five thousand dollars ($75,000.00)." Nowhere does Refined tie up the loose end that the district court identified (*i.e.* the failure to specify that the required amount is satisfied without considering interest and costs), nor does it even acknowledge the existence of an adverse ruling on this question. This is waiver, and it leaves no further basis for federal jurisdiction over the state-law claims, which can still be pursued in state court should Refined so desire.

### III

We AFFIRM the judgment of the district court.